IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| IN RE: ENVIRONMENTAL PROTECTION AGENCY AND DEPARTMENT OF DEFENSE, FINAL RULE: CLEAN WATER RULE: DEFINITION OF "WATERS OF THE UNITED STATES," 80 FED. REG. 37,054 PUBLISHED ON JUNE 29, 2015 (MCP NO. 135). | : : : : | Docket No. 15-3751 and related cases: 15-3799, 15-3817, 15-3820, 15-3822, 15-3823, 15-3831, 15-3837, 15-3839, 15-3850, 15-3853, 15-3858, 15-3885, 15-3887 |

**MOTION BY STATES OF NEW YORK, CONNECTICUT, HAWAII, MASSACHUSETTS, OREGON, VERMONT, AND WASHINGTON, AND THE DISTRICT OF COLUMBIA, TO INTERVENE IN SUPPORT OF RESPONDENTS IN DOCKET NO. 15-3751 AND IN EACH OF THE RELATED CASES**

BARBARA D. UNDERWOOD
  *Solicitor General*
STEVEN C. WU
  *Deputy Solicitor General*
ANDREW B. AYERS
  *Assistant Solicitor General*
LEMUEL M. SROLOVIC
  *Bureau Chief,*
  *Environmental Protection Bureau*
PHILIP BEIN
TIMOTHY HOFFMAN
  *Assistant Attorneys General*
  *Environmental Protection Bureau*
    *Of Counsel*

ERIC T. SCHNEIDERMAN
  *Attorney General of the*
  *State of New York*
Attorney for Proposed Intervenor
  the State of New York
The Capitol
Albany, New York 12224-0341
(518) 776-2413

*Additional Counsel on Signature Page*

## PRELIMINARY STATEMENT

Under Rule 15(d) of the Federal Rules of Appellate Procedure, the states of New York, Connecticut, Hawaii, Massachusetts, Oregon, Vermont, and Washington, and the District of Columbia (collectively, Proposed Intervenor States or States), hereby move for leave to intervene in support of respondents United States Environmental Protection Agency (EPA), the United State Army Corps of Engineers (Army Corps), and their officers in Docket No. 15-3751 and in each of the related petitions:  Docket Nos. 15-3799, 15-3817, 15-3820, 15-3822, 15-3823, 15-3831, 15-3837, 15-3839, 15-3850, 15-3853, 15-3858, 15-3885, and 15-3887.

In these 14 petitions, petitioners challenge the promulgation of the Clean Water Rule by EPA and the Army Corps.  *See* 80 Fed. Reg. 37054 (June 29, 2015).  The Rule defines the term "waters of the United States" as used in the federal Clean Water Act, 33 U.S.C. § 1251 *et seq.,* thereby establishing the scope of protection under the Act.

Proposed Intervenor States support the Clean Water Rule because it protects their water quality, assists them in administering water pollution programs by dispelling confusion about the Act's reach, and

1

prevents harm to their economies by ensuring adequate regulation of waters in upstream states. The States respectfully request that the Court grant this motion based on their strong direct and substantial interests in the outcome of the petitions.[1]

Counsel for movants contacted counsel for all petitioners and respondents in the petitions concerning their position on this motion. Respondents EPA and Army Corps have stated that they do not oppose the motion, as have the petitioners in the following 12 petitions: Docket Nos. 15-3751, 15-3799, 15-3817, 15-3820, 15-3822, 15-3823, 15-3831, 15-3837, 15-3839, 15-3850, 15-3853, and 15-3858. Counsel for petitioners in Docket No. 15-3887 stated that they do not object to the States' intervention provided that it does not delay the briefing schedule. Counsel for petitioners in Docket No. 15-3885 stated that they take no position on the States' intervention  but reserve the right to oppose following their review of this motion.

---

[1] The District of Columbia supports the rule overall because of the environmental benefits it will provide in improving water quality, but it maintains its concerns that were articulated in comments provided to EPA on November 17, 2014 by the Department of Energy & Environment (formerly known as the District Department of the Environment).

## A.   The Clean Water Act and "Waters of the United States"

In 1972, Congress determined that America's waters were "severely polluted" and "in serious trouble,"[2] and that "the federal water pollution control program . . . has been inadequate in every vital respect." *Milwaukee v. Illinois*, 451 U.S. 304, 310 (1981).   In "dramatic response to accelerating environmental degradation of rivers, lakes, and streams in this country," *Natural Resources Defense Council v. Costle*, 568 F.2d 1369, 1371 (D.C. Cir. 1977), Congress enacted amendments to the Federal Water Pollution Control Act, known commonly as the "Clean Water Act," 33 U.S.C. § 1251 *et seq.*, with the sole "objective . . . 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'   In order to achieve that objective, Congress declared that 'it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985.'" *Costle v. Pac. Legal Found.*, 445 U.S. 198, 202 (1980) (internal citations omitted).

---

[2] S. Rep. No. 92-414, (1972), reprinted in 1 Environmental Policy Division, Congressional Research Service, *A Legislative History of the Water Pollution Control Act Amendments of 1972* at 1425 (U.S. G.P.O. 1973); H. Rep. No 92-911, at 66 (1972), *reprinted in* I 1972 Leg. Hist., at 753.

The Act represents "a partnership between the States and the Federal Government." *Arkansas v. Oklahoma*, 503 U.S. 91, 101-02 (1992). The Act establishes minimum pollution controls that are applicable nationwide, and states may not adopt or enforce controls that are less stringent than those promulgated under the Act. *See* 33 U.S.C. § 1370(1). The Act's nationwide pollution controls protect downstream states from pollution originating outside their borders. They serve to prevent the 'Tragedy of the Commons' that might result if jurisdictions could compete for industry and development by allowing more water pollution than their neighboring states. *NRDC*, 568 F.2d at 1378 (citing *NRDC v. Train*, 510 F.2d 692, 709 (D.C. Cir. 1975)).

The Act's regulatory scope applies to "navigable waters," defined as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). But the Act does not define "waters of the United States," despite the importance of that term.

The absence of a clear and appropriate definition of "waters of the United States" can undermine the Act's objective of restoring and maintaining the health of the Nation's waters. Without such a definition, the scope of many  programs central to the Act may be

difficult to determine and waters may go unprotected.  For example, the Act protects wetlands from destruction, and enhances downstream water quality, by prohibiting discharges of dredge or fill material unless authorized by the Army Corps in a Section 404 permit or by a state that chooses to administer the Section 404 program.  33 U.S.C. §§ 1311(a), 1344.  As noted by Justice Kennedy in his concurrence in *Rapanos v. Army Corps*, the filling of wetlands

> may increase downstream pollution, much as a discharge of toxic pollutants would.  Not only will dirty water no longer be stored and filtered [by the wetlands] but also the act of filling and draining may itself cause the release of nutrients, toxins, and pathogens that were trapped, neutralized, and perhaps amenable to filtering or detoxification in the wetlands.

547 U.S. 715, 775 (2006).   But this program applies only to discharges into the "waters of the United States."

Similarly, the Act broadly prohibits pollutant discharges unless authorized by a National Pollutant Discharge Elimination System (NPDES) permit generally issued by the states and in some cases by EPA.  33 U.S.C. §§ 1311(a), 1342.  In fact, the NPDES program is "the primary means" for achieving the Act's ambitious water quality objectives, and serves as "a critical part of Congress' 'complete

rewriting' of federal water pollution law." *Arkansas***,** 503 U.S. at 101-02 (quoting *Milwaukee*, 451 U.S. at 317).    But the Act's pollution prohibition and NPDES program apply only to discharges into the "waters of the United States."

In addition, the Act requires states to set water quality standards for waters within their borders and empowers states to issue or withhold "water quality certifications" needed for applicants for federal licenses or permits to conduct activities that may result in discharges into those waters.  33 U.S.C. § 1341.  But states can only protect their waters by performing these functions when the involved waters are deemed "waters of the United States."

Since the Act's creation, the Army Corps and EPA have interpreted "waters of the United States" pursuant to agency practice and regulation.    At times the federal agencies' interpretation has been upheld by the courts, while at other times it has not.  *Compare United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985), *with Solid Waste Agency of N. Cook County v. Army Corps*, 531 U.S. 159 (2001) *and Rapanos*, 547 U.S. at 739 (plurality opinion).

In *Rapanos*, all members of the Court agreed that the Act's jurisdiction extends beyond "traditional navigable waters," also known as "navigable in fact" waters, *i.e.*, waters capable of navigation. But as to non-traditional navigable waters, no single interpretation of "waters of the United States" commanded a majority of the Supreme Court. In *Rapanos*, the plurality interpreted "waters of the United States" to include: (1) relatively permanent, standing or continuously flowing bodies of water that are connected to traditional navigable waters, and (2) wetlands with a continuous surface connection to relatively permanent waters. *Rapanos*, 547 U.S at 739, 742. The plurality opinion also stated that waters that might dry up in a drought, or seasonal rivers which have continuous flow during some months of the year, are not necessarily excluded from the Act's jurisdiction. *Id*. at 732 n.5.

In contrast, Justice Kennedy's concurrence in the judgment, which was needed to secure a majority, endorsed a "significant nexus test" in which wetlands (and presumably other waters such as tributaries) would qualify as "waters of the United States" if they "possess a significant nexus to waters that are or were navigable in fact or that

7

could reasonably be so made." *Rapanos*, 547 U.S at 759 (internal quotations omitted).  According to Justice Kennedy, wetlands have the requisite significant nexus if "either alone or in combination with similarly situated [wet]lands in the region, [they] significantly affect the chemical, physical and biological integrity of other covered waters more readily understood as 'navigable.'" *Id.* at 780.

In the wake of *Rapanos*, a complex and confusing split developed among the federal courts regarding which waters are "waters of the United States" and therefore within the Act's jurisdiction.  The federal circuits have embraced at least three distinct approaches in instances of uncertain jurisdiction, with some courts adopting Justice Kennedy's significant-nexus test (*see, e.g.*, *United States v. Gerke Excavating Inc.*, 464 F.3d 723 (7th Cir. 2006)), some holding that waters are within the Act's jurisdiction if *either* the plurality or significant-nexus test is satisfied (*see, e.g., United States v. Donovan*, 661 F.3d 174 (3d Cir. 2011)), and some tending to defer to the agencies' fact-based determinations (*see, e.g., Precon Dev. Corp. v. Army Corps*, 633 F.3d 278 (4th Cir. 2011)).

## B.    Promulgation of the Clean Water Rule

In April 2014, EPA and the Army Corps published a proposed rule to define "waters of the United States," and made the rule available for an extended public comment period.    79 Fed. Reg. 22188 (Apr. 21, 2014).    After receiving over one million comments, most of which supported the rule, the agencies published the final rule on June 29, 2015.  *See* 80 Fed. Reg. 37054.

The rule clarifies the scope of "waters of the United States" that are protected under the Act, and reduces the agencies' reliance on time-consuming, inefficient, and potentially inconsistent case-by-case jurisdictional determinations.  In issuing the rule, EPA and the Army Corps relied on "the text of the statute, Supreme Court decisions, the best available peer-reviewed science, public input, and the agencies' technical expertise and experience in implementing the statute."  80 Fed. Reg. at 37055.  The agencies assessed whether upstream waters have a "significant nexus" to downstream waters "in terms of the CWA's objective to 'restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'"  *Id*. at 37055.  In doing so, the agencies relied substantially on a comprehensive report prepared by

EPA's Office of Research and Development, entitled "Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence" (Science Report), and review of this report by EPA's Science Advisory Board.  The Science Report itself is based on a review of more than 1200 peer-reviewed publications.  The Report and review by the Science Advisory Board concluded that tributary streams, and wetlands and open waters in floodplains and riparian areas, are connected to and strongly affect the chemical, physical, and biological integrity of downstream traditional navigable waters, interstate waters, or the territorial seas.  *Id.* at 37057.

The agencies' current procedures for determining whether waters are within the Act's jurisdiction often entail detailed and time-consuming case-by-case analyses that can be inconsistent.  The rule reduces the agencies' reliance on case-by-case analyses by establishing categories of jurisdictional waters that fall within the scope of the "water of the United States."  These categories consist of:  (1) traditional navigable waters, (2) interstate waters, (3) the territorial seas, (4) impoundments of jurisdictional waters, (5) tributaries, and (6) adjacent waters (which consist primarily of wetlands).  The Rule also establishes

three categories of potentially jurisdictional waters, which fall within the scope of "waters of the United States" if a case-by-case analysis determines that they have a significant nexus to traditional navigable waters, interstate waters, or the territorial seas.  These case-by-case waters are:  (i) certain similarly situated regional waters (Prairie potholes, Carolina and Delmarva bays, pocosins, western vernal pools in California, and Texas coastal prairie wetlands) that drain to a water in categories 1 through 3 above; (ii) waters within the 100-year floodplain of a water in categories 1 through 3 above; and (iii) waters within 4,000 feet of the high tide line or ordinary high-water mark of a water in categories 1 through 5 above.

## C.    Challenges to the Rule

After publication of the rule, opponents of the rule filed various actions in federal district courts and petitions for review in eight circuit courts seeking to invalidate it.  On July 28, 2015, the judicial panel on multidistrict litigation randomly selected the Sixth Circuit to hear the consolidated petitions.

# ARGUMENT

## PROPOSED STATE INTERVENORS' MOTION TO INTERVENE SHOULD BE GRANTED BECAUSE THEY HAVE A DIRECT AND SUBSTANTIAL INTEREST IN THE LEGALITY OF THE CLEAN WATER RULE

Rule 15(d) of the Federal Rules of Appellate Procedure (FRAP) requires that a party moving to intervene state its interest and the grounds for intervention. Intervention under Rule 15(d) is granted where the moving party's interests in the outcome of the action are direct and substantial. *See, e.g., Bales v. NLRB*, 914 F.2d 92, 94 (6th Cir. 1990) (granting Rule 15(d) intervention to party with "substantial interest in the outcome"); *Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 744-45 (D.C. Cir. 1986) (intervention allowed under Rule 15(d) because petitioners were "directly affected by" agency action). The decision to allow intervention should be guided by practical considerations and the "need for a liberal application in favor of permitting intervention." *Nuesse v. Camp*, 385 F.2d 694, 702 (D.C. Cir. 1967).

The Supreme Court has suggested that "the policies underlying intervention [under Rule 24 of the Federal Rules of Civil Procedure] may be applicable in appellate courts." *Auto Workers v. Scofield*, 382

U.S. 205, 216 n.10 (1965). And other courts of appeals have looked to Rule 24 of the Federal Rules of Civil Procedure for standards governing intervention. *See Sierra Club v. EPA*, 358 F.3d 516, 517-18 (7th Cir. 2004). Under Rule 24(a), a motion to intervene as of right is granted if: (1) it is timely; (2) the movant has a substantial legal interest in the subject matter of the case that will be impaired in the absence of intervention; and (3) the parties already before the court do not adequately represent that interest. *United States v. Michigan*, 424 F.3d 438, 443 (6th Cir. 2005). As with FRAP 15(d), Rule 24 should be "broadly construed in favor of potential intervenors." *Purnell v. City of Akron*, 925 F.2d 941, 950 (6th Cir. 1991).

Under any interpretation of the applicable standards, the Proposed Intervenor States' motion should be granted.

*First*, this motion is timely in seeking to intervene in each of the petitions (other than Docket No. 15-3751) because it is brought within 30 days after the petitions for review were filed in this Circuit. *See* FRAP 15(d). The States have separately brought a motion to extend their time to move to intervene in Docket No. 15-3751.

Next, the Proposed Intervenor States have a substantial and direct

13

interest in the subject of this action, namely the validity of the Clean Water Rule. That interest manifests itself in three principal ways. *First*, the rule protects the waters of Proposed Intervenor States. The rule is grounded in peer-reviewed scientific studies that confirm fundamental hydrologic principles. Water flows downhill, and connected waters, singly and in the aggregate, transport physical, chemical and biological pollution that affects the function and condition of downstream waters, as demonstrated by the Scientific Report on which EPA and the Army Corps rely. The health and integrity of watersheds, with their networks of tributaries and wetlands that feed downstream waters, depend upon protecting the quality of upstream headwaters and adjacent wetlands. Moreover, watersheds frequently do not obey state boundaries, with all of the lower forty-eight states having waters that are downstream of the waters of other states. Thus, coverage under the Act of ecologically connected waters secured by the Rule is essential to achieve the water quality protection purpose of the Act, and to protect Proposed Intervenor States from upstream pollution occurring outside their borders.

    *Second*, by clarifying the scope of "waters of the United States," the

rule promotes predictability and consistency in the application of the law, and in turn helps clear up the confusing body of case law that has emerged in the wake of the Supreme Court's *Rapanos* decision. The Rule accomplishes this by reducing the need for case-by-case jurisdictional determinations and, where such determinations are needed, by clarifying the standards for conducting them. Each of the Proposed Intervenor States implements programs under the Act. Thus, the rule is of direct benefit to movants because it helps alleviate administrative burdens and inefficiencies in carrying out those programs. In addition, the rule would help the States in administering the federal dredge-and-fill program if they choose to do so. *See* 33 U.S.C. §1344 (allowing States to implement a permitting program for dredge and fill material).

*Third*, the rule advances the Act's goal of securing a strong federal "floor" for water pollution control, thereby protecting the economic interests of Proposed Intervenor States and other downstream states. The Rule allows movants to avoid having to impose costly, disproportionate, and economically harmful limits on in-state pollution sources to waters within their borders, in order to offset

15

upstream discharges that would otherwise go unregulated if the upstream waters are deemed to fall outside the Act's jurisdiction and are not otherwise regulated by upstream states.  The Rule protects the economies of Proposed Intervenor States because it serves to "prevent the 'Tragedy of the Commons' that might result if jurisdictions can compete for industry and development by providing more liberal limitations than their neighboring states."  *NRDC*, 568 F.2d at 1378 (quoting *Train*, 510 F.2d at 709).

In summary, Proposed Intervenor States have direct and substantial interests in the outcome of these petitions, and invalidation of the rule would impair and impede these interests.

Moreover, while respondent federal agencies and the States both support the rule, their interests are distinct.  As this Court has recognized, the required showing of inadequacy is "minimal because it need only be shown that there is a *potential* for inadequate representation." *United States v. Michigan*, 424 F.3d at 443 (quotations omitted; emphasis in original).  EPA and the Army Corps cannot be assumed to adequately represent the interests of Proposed Intervenor States. *See Forest Conserv. Council v. U.S. Forest Serv.,* 66 F.3d 1489,

1499 (9th Cir. 1995) (the interests of one governmental entity may not be the same as those of another governmental entity).  For example, EPA and the Army Corps may seek to settle or resolve the petitions and other related cases brought by non-parties to the petitions in ways that might be adverse to the States' interests, or may rely upon legal doctrines that otherwise undermine their interests.  Under this Court's precedents, "[i]nterests need not be wholly 'adverse' before there is a basis for concluding that existing representation of a 'different' interest may be inadequate."  *Purnell v. Akron*, 925 F.2d 941, 950 (6th Cir. 1991).  Indeed, "it may be enough to show that the existing party who purports to seek the same outcome will not make all of the prospective intervenor's arguments."  *Grutter v. Bollinger*, 188 F.3d 394, 400 (6th Cir. 1999) (emphasis in original).  Because of the unique interests and role of the States in implementing the Act's programs, EPA and the Army Corps cannot be expected to make the same arguments in support of the Rule as the States would.  Under these standards, the motion to intervene should be granted.

## CONCLUSION

For the reasons stated above, the Proposed Intervenor States respectfully request that this Court grant their motion to intervene in these proceedings.

Dated:  Albany, New York
        August 28, 2015

Respectfully submitted,

ERIC T. SCHNEIDERMAN
*Attorney General of the*
*State of New York*

By: /s/ Philip Bein

PHILIP BEIN
Assistant Attorney General

BARBARA D. UNDERWOOD
  *Solicitor General*
STEVEN C. WU
  *Deputy Solicitor General*
ANDREW B. AYERS
  *Assistant Solicitor General*
LEMUEL M. SROLOVIC
  *Bureau Chief,*
  *Environmental Protection Bureau*
PHILIP BEIN
TIMOTHY HOFFMAN
  *Assistant Attorneys General*
  *Environmental Protection Bureau*
   *Of Counsel*

Environmental Protection Bureau
Office of the Attorney General
The Capitol
Albany, New York 12224-0341
(518) 776-2413

GEORGE JEPSEN
  *Attorney General*
  *State of Connecticut*

By: /s/ Kirsten S.P. Rigney
Assistant Attorney General

Office of the Attorney General
55 Elm Street
P.O. Box 120
Hartford, CT  06106


MAURA HEALEY
  *Attorney General*
  *Commonwealth of Massachusetts*

By: /s/ Seth Schofield
Assistant Attorney General

Environmental Protection Division
Senior Appellate Counsel
Energy and Environment Bureau
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108


WILLIAM H. SORRELL
  *Attorney General*
  *State of Vermont*

By: /s/ Scot L. Kline
Assistant Attorney General

State of Vermont
Office of the Attorney General
109 State Street
Montpelier, VT 05609-1001


DOUGLAS S. CHIN
  *Attorney General*
  *State of Hawai`i*

By: /s/ Edward G. Bohlen*
Deputy Attorney General

Department of the Attorney General
Health and Human Services
  Division
465 South King Street, Room 200
Honolulu, HI  96813-2913


ELLEN F. ROSENBLUM
  *Attorney General*
  *State of Oregon*

By: /s/ Paul A. Garrahan
Attorney-in-Charge

Natural Resources Section
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096


ROBERT W. FERGUSON
  *Attorney General*
  *State of Washington*

By: /s/ Ronald L. Lavigne
Senior Counsel

2425 Bristol Court SW, 2nd Fl.
Olympia, WA 98504


19

KARL A. RACINE
  *Attorney General*
  *District of Columbia*

By: /s/ Loren L. AliKhan*
Deputy Solicitor General

Office of the Solicitor General
Office of the Attorney General
One Judiciary Square
441 4th Street, NW, Suite 600S
Washington, D.C. 20001

  ***Applying for Admission to
    Sixth Circuit Bar*

20