**Nos. 15-3799, 15-3822, 15-3853, 15-3887**
# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| STATE OF OHIO, *ET AL.*, | : | |
|     Petitioners, | : | |
|     v. | : | No. 15-3799 |
| U.S. ARMY CORPS OF ENGINEERS, *ET AL.*, | : | |
|     Respondents. | : | |
| STATE OF OKLAHOMA, | : | |
|     Petitioner, | : | |
|     v. | : | No. 15-3822 |
| U.S. E.P.A., *ET AL.*, | : | |
|     Respondents. | : | |
| STATE OF TEXAS, *ET AL.*, | : | |
|     Petitioners, | : | |
|     v. | : | No. 15-3853 |
| U.S. E.P.A., *ET AL.*, | : | |
|     Respondents. | : | |
| STATE OF GEORGIA, *ET AL.*, | : | |
|     Petitioners, | : | |
|     v. | : | No. 15-3887 |
| U.S. E.P.A., *ET AL.*, | : | |
|     Respondents. | : | |

## STATE PETITIONERS' MOTION FOR STAY PENDING REVIEW

The Rule purporting to define "waters of the United States" ("WOTUS Rule") is clearly illegal and is currently imposing irreparable harm on the States. It unlawfully asserts federal authority over millions of acres of intrastate waters and sometimes wet lands, in violation of the Clean Water Act ("CWA"), the Administrative Procedure Act ("APA"), Supreme Court precedent, and the

Constitution.  The Rule is causing irreparable harm to the States by seizing their sovereign authority over intrastate waters and by imposing substantial costs under the CWA's state-administered programs.[1]

Although statute and precedent reflect that jurisdiction to redress the Rule's harms lies with the district courts, *see* States' Motion to Dismiss, the Agencies and some district judges disagree.  The District of North Dakota correctly concluded that district courts, not courts of appeals, have jurisdiction over the Rule, and preliminarily enjoined the Rule in thirteen States.  Other district courts have refused to issue similar preliminary injunctions sought by other States, either concluding jurisdiction was not proper in district court or that considerations of jurisdiction and/or potential consolidation required a stay.

Given the Rule's manifest illegality and harms to the States, this inconsistent application of the WOTUS Rule should not be allowed to stand.  This Court should stay the Rule, on a nationwide basis, pending completion of its review.

## STATEMENT OF FACTS

A. Under the CWA, Congress recognized the State's traditional power over land and water use.  The CWA provides that "[i]t is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States . . . to plan the development and use . . . of land and water resources."  33 U.S.C.

---

[1] On July 28, 2015, the States requested that the Agencies stay the Rule pending litigation.  The Agencies have not granted this request.

§ 1251(b).  Congress thus left to the States authority over intrastate waters, while giving the Agencies regulatory authority only over "navigable waters," defined as "waters of the United States, including the territorial seas."  *Id.* § 1362(7).

The definition of "waters of the United States" delineates the scope of numerous provisions in the CWA, including obligations imposed upon the States.  A party that causes discharges into "waters of the United States" must obtain a permit under the National Pollutant Discharge Elimination System ("NPDES") program, *id.* § 1342, or under Section 404 for discharge that is dredge and fill, *id.* § 1344.  The States are directly involved in administering the NPDES and Section 404 permitting programs, as well as the CWA's Water Quality Standards ("WQS") program.  *Id.* §§ 1313, 1341, 1342; 40 C.F.R. § 130.7.

B. On June 29, 2015, the Agencies published the final Rule, which differed from the proposed version of the Rule in several material respects, as described below.  *See infra* pp. 7-10.  The final Rule, effective August 28, 2015, defines primary waters to encompass "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce," as well as "[a]ll interstate waters, including interstate wetlands," and the "territorial seas."  33 C.F.R. § 328(a).  The Rule then declares additional waters as CWA jurisdictional, including three sweepingly broad categories relevant for this motion.

*First*, the Rule claims automatic federal jurisdiction over "[a]ll tributaries," 33 C.F.R. § 328.3(a)(5), defined as any "water that contributes flow, either directly or through another water" to a primary water and is "characterized by the presence of the physical indicators of a bed and bank and an ordinary high water mark ['OHWM']," *id.* § 328.3(c)(3). By the Agencies' own characterization, this definition includes usually dry channels that provide "intermittent or ephemeral" flow through "any number" of links. 80 Fed. Reg. at 37,076.

*Second*, the Rule asserts automatic federal jurisdiction over all waters "adjacent" to primary waters and their "tributaries." 33 C.F.R. § 328.3(a)(6). The Rule defines "adjacent" to include: (1) "all waters" any part of which is located within 100 feet of the OHWM of a primary water or "tributary"; (2) "all waters" within 1,500 feet of the OHWM of a primary water or "tributary" and within its 100-year floodplain; and (3) all waters any part of which is within 1,500 feet of the high tide line of a primary water. 33 C.F.R. § 328.3(c)(2).

*Third*, the Rule grants the Agencies authority over additional waters if they are determined to have a "significant nexus" to a primary water, including all waters any part of which is within 4,000 feet of the high tide line or OHWM of a primary water, impoundment, or "tributary." *Id.* § 328.3(a)(8). Under the Rule, a water is deemed to have a "significant nexus" to a primary water if that water, "either alone or in combination with other similarly situated waters in the region,

4

significantly affects the chemical, physical, *or* biological integrity of a [primary water]" based on "any single function or combination of functions performed by the water." *Id.* § 328.3(c)(5) (emphasis added).

C.   After the Rule was published in the Federal Register, thirty-one States sued to stop the Rule in federal district courts around the country.  Many of these States sought preliminary injunctions to stop the Rule before it became effective on August 28, 2015.   The Southern District of Georgia denied a preliminary injunction because it concluded that the court of appeals was the proper venue for a lawsuit challenging the Rule.  Doc. No. 77, No. 2:15-cv-00079 (S.D. Ga. Aug. 27, 2015).  The Northern District of Oklahoma stayed the action, also pointing to the possibility of court of appeals jurisdiction.  Doc. No. 22 at 8, No. 4:15-cv-0381 (N.D. Okla. July 31, 2015).  The Southern District of Ohio and Southern District of Texas have similarly stayed those actions.  Doc. 27 at 7, No. 2:15-cv-2467 (S.D. Ohio Sept. 1, 2015); Doc. 15 at 1, No. 3:15-cv-0162 (S.D. Tex. Aug. 14, 2015).[2]

In contrast, the District of North Dakota properly held that jurisdiction to review the WOTUS Rule lies in the district courts, and then granted a preliminary injunction.  Doc. No. 70, *North Dakota v. EPA*, No. 3:15-cv-00059 (D. N.D.) ("ND PI").  Chief Judge Erickson concluded that the Rule is likely illegal because, *inter*

---

[2] Yesterday, September 8, 2015, the plaintiff States in the Southern District of Texas action filed motions seeking a partial lifting of the stay, expedited treatment and a preliminary injunction.  Doc. 17, No. 3:15-cv-0162.

*alia*, the rule violated the APA's notice-and-comment and reasoned decision making requirements, and the CWA. *Id.* at 6-15. The court determined an injunction was necessary because the Rule irreparably diminishes the States' sovereign power over their waters and requires the States to incur unrecoverable expenses. *Id.* at 16-17. Last Friday, September 4, the court held that its preliminary injunction only applied to the thirteen States in the North Dakota litigation. ND Doc. No. 79.

The States also filed protective petitions for review in courts of appeals throughout the country, making clear that those petitions should be dismissed for lack of jurisdiction as falling outside of the narrow bounds of 33 U.S.C. § 1369. *See Lake Cumberland Trust, Inc. v. EPA*, 954 F.2d 1218, 1222-24 (6th Cir. 1992). Pursuant to 28 U.S.C. § 2112, those petitions were consolidated in this Court.

## ARGUMENT

In reviewing a motion for a stay, this Court considers: (1) the likelihood that the movant will prevail on the merits; (2) the prospect of irreparable harm if relief is withheld; (3) the possibility of substantial harm to others if relief is granted; and (4) the public interest. *See Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991). "These factors are not prerequisites that must be met, but are interrelated considerations that must be balanced together." *Id*. All four factors favor a stay in this case.

## I.   Petitioners Are Likely To Prevail On The Merits

Petitioners need only show "a sufficient probability of success on the merits." *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 155 (6th Cir. 1991). "[A] movant need not always establish a high probability of success on the merits," *id.* at 153, because the "strength of the likelihood of success on the merits that needs to be demonstrated is inversely proportional to the amount of irreparable harm that will be suffered if a stay does not issue." *Baker v. Adams Cnty./Ohio Valley Sch. Bd.*, 310 F.3d 927, 928 (6th Cir. 2002).

### A.   The Agencies Adopted The WOTUS Rule In Violation Of The APA's Notice And Comment Requirements

To comply with the APA's notice-and-comment requirement, an agency's final rule must be a "logical outgrowth" of the proposal. *See Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007). The question is whether the public "should have anticipated that [the] requirement" embodied in the final rule might be adopted. *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 549 (D.C. Cir. 1983). Thus, in *Small Refiner*, EPA proposed to define "small refinery" as a refinery that was not owned by a large refiner and then asked the public generically for changes to this definition. The agency also asked "whether a 2.50 [grams of lead per gallon] standard [for small refineries] was too generous and whether a standard such as 2.15 . . . may be more appropriate." *Id.* at 513 (quotations omitted). In the final rule, EPA revised the definition of "small

7

refinery" by adding a date-of-ownership limitation and set an interim standard of 1.90 grams of lead per gallon for those refineries. *Id.* at 513-14. The D.C. Circuit held that neither change was a "logical outgrowth[]" of the proposal because the agency had not provided to the public "the range of alternatives being considered with reasonable specificity." *Id.* at 542-44, 548-49; *accord CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1078 (D.C. Cir. 2009).

The final WOTUS Rule violates the notice-and-comment requirement in at least two critical respects, each of which suffices to require the Rule's vacatur:

*First*, with regard to adjacent waters, the proposed version of the Rule defined "adjacent waters" as all waters and sometimes wet lands in a so-called "riparian area" or "flood plain." 79 Fed. Reg. 22,188, 22,269 (Apr. 21, 2014). The final Rule changed course entirely, relying upon distance-based concepts such as location within a 100-year floodplain *and* within 1,500 feet of a primary water, impoundment, or tributary; or 1,500 feet from a high tide line of a primary water. As the District of North Dakota held, these definitions "are different in degree and kind and wholly removed from" the proposal, such that they are a "transmogrify[ication]" of the Rule. ND PI, at 15.

*Second*, as to case-by-case waters, the proposal established a catchall category of waters potentially subject to the Agencies' authority if they "significantly affect[] the chemical, physical, or biological integrity" of a primary

water.  79 Fed. Reg. at 22,269.  The final Rule unexpectedly focused the Agencies'
"significant nexus" inquiry on waters within the 100-year floodplain of a primary
water, as well as waters within 4,000 feet of a primary water, impoundment, or
tributary.  33 C.F.R. § 328.3(a)(8).  The Agencies provided no suggestion that they
were considering distance parameters as to case-by-case waters, seeking comment
only in a generic fashion on *anything* that could "lead to greater clarity, certainty,
and predictability."  79 Fed. Reg. at 22,214-17.  Again, the Agencies failed to
inform the public of "the range of alternatives being considered with reasonable
specificity."  *Small Refiner*, 705 F.2d at 549.

The Agencies' notice-and-comment failure here is more significant than in
*Small Refiner*, or any other case of which the States are aware.  In the WOTUS
Rule, the Agencies seek to apply entirely unexpected approaches to defining both
adjacent and case-by-case waters *for all of the waters and lands in the United
States*.  Defining the scope of the CWA is one of the most consequential and
complicated decisions that the federal bureaucracy can make, making articulation
of the "range of options" essential to ensure meaningful public comment.

As illustrated by documents published by the U.S. House of Representatives
Committee on Oversight and Government Reform, the lack of notice deprived the
States of the opportunity to build a record against or explain the consequences of
the unexpected distance limitations.  In those internal documents created when the

9

Agencies were drafting the final Rule, the Corps took issue with several of the distance-based approaches that EPA ultimately adopted, arguing that those approaches have "no basis in science or law, and thus [are] 'arbitrary,'" and "depart significantly from the version provided for public comment."[3]

## B.    Central Aspects Of The WOTUS Rule Are Arbitrary And Without Any Record Support

A final rule must be "set side" if that rule is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A). The agency must show a rational connection between the facts it relies upon and its final rule, such that the rule is the "product of reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 & 52 (1983); *accord Cincinnati Bell Tel. Co. v. FCC*, 69 F.3d 752, 767-68 (6th Cir. 1995).

The distance-based definitions that are the heart of the Rule's adjacency and case-by-case waters fail this basic APA requirement. The Agencies' only explanation of their distance-based approach is that the various distances are "reasonable and practical boundar[ies]," consistent with unspecified "experience" and "the implementation value of drawing clear lines," 80 Fed. Reg. at 37,085-91. But the Agencies' own experts specifically *rejected* the Agencies' distance-based approach, explaining that "the available science supports defining adjacency or

---

[3] Doc. No. 62-3 at 2, *Georgia v. McCarthy*, No. 2:15-cv-00079 (S.D. Ga.); Doc. No. 62-2 at 1, *Georgia v. McCarthy*, No. 2:15-cv-00079 (S.D. Ga.); *id.* at 5 ("1500-feet limitation is not supported by science or law").

determination of adjacency on the basis of functional relationships, not on how close an adjacent water is to a navigable water." Letter from Science Advisory Board to Gina McCarthy, EPA-SAB-14-007, at *2-3 (Sept. 30, 2014). Nothing in the record explains, for example, why a 1,500 or "a 4,000 foot standard is scientifically supportable." ND PI, at 13. As the District of North Dakota explained, "[w]hile a 'bright line' test is not in itself arbitrary, the Rule must be supported by some evidence why a 4,000 foot standard is scientifically supportable. On the record before the court, it appears that the standard is the right standard because the Agencies say it is." *Id.*

The lack of any record discussion of the Rule's distance limitations is also further proof of the notice-and-comment failure discussed earlier. Because the Agencies sprung the Rule's distance-based approach on the public when they announced the final Rule, they deprived the public of the meaningful right to submit comments, studies, and maps that would have facilitated an on-the-record assessment of the Rule's rationality.

## C.    The WOTUS Rule Violates The CWA In Multiple Respects

In *Rapanos v. United States*, 547 U.S. 715 (2006), the Court rejected the Corps' assertion of CWA authority over intrastate wetlands that are not significantly connected to navigable, interstate waters. The Court's majority consisted of a four-Justice plurality opinion and Justice Kennedy's opinion

concurring in the judgment. The plurality opinion concluded that only relatively permanent waters truly adjacent to traditional interstate waters and waters with a "continuous surface connection" to such waters fall within the CWA. *Id.* at 742. Justice Kennedy wrote separately and explained that the Agencies only have authority over waters that are navigable-in-fact and waters with a "significant nexus" to navigable waters. *Id.* at 779. The WOTUS Rule violates the CWA, as articulated by Justice Kennedy in *Rapanos*, in at least three respects.[4]

1. *Per Se* Coverage Of "Tributaries." The Rule's conclusion that all "tributaries" are jurisdictional violates the CWA. Under the Rule, a tributary has "a bed and banks and an [OHWM]" and "contributes flow"—no matter how ephemeral—"either directly or through another water" to a primary water. 33 C.F.R. § 328.3(c)(3). The WOTUS Rule sweeps in *all* such channels, including typically dry land features that ever contribute even the smallest trickle into a navigable water, either directly or indirectly. 80 Fed. Reg. at 37,076.

But in *Rapanos*, Justice Kennedy reasoned that while having an OHWM "presumably provides a rough measure of the volume and regularity of flow," that characteristic alone is insufficient for asserting the significant nexus necessary for

---

[4] Although this Court has not yet decided whether CWA jurisdiction should be assessed only against Justice Kennedy's test, *see United States v. Cundiff*, 555 F.3d 200, 208-09 (6th Cir. 2009), that is the basis on which the Agencies have justified the Rule, so any other argument is foreclosed, *see SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943).

CWA jurisdiction over "drains, ditches, and streams remote from any navigable-in-fact water and carrying only minor water volumes toward it." *Id.* at 781. Moreover, Justice Kennedy explained that the CWA cannot cover all "continuously flowing stream[s] (however small)" or waters sending only the "merest trickle[s]" into navigable waters. *Id.* at 776-77 & 769. As the District of North Dakota held, "the breadth of the definition of a tributary set forth in the Rule allows for regulation of any area that has a trace amount of water so long as the physical indicators of a bed and banks and an OHWM exist. This is precisely the concern Justice Kennedy had in *Rapanos*, and indeed the general definition of tributary is strikingly similar." ND PI, at 11 (quotation and footnotes omitted).

2. *Per Se* Coverage Of All "Adjacent" Waters. The Rule's assertion of *per se* jurisdiction over all "adjacent waters" similarly violates the CWA. In *Rapanos*, Justice Kennedy held that the Corps' "regulation of drains, ditches, and streams remote from any navigable-in-fact water and carrying only minor water volumes toward it . . . *precludes its adoption as the determinative measure of whether adjacent wetlands* are likely to play an important role in the integrity of an aquatic system comprising navigable waters as traditionally understood." *Id.* at 782 (emphasis added). But the Rule re-imposes much the same requirement, 33 C.F.R. § 328.3(a)(8), including asserting *per se* jurisdiction over various waters within the 100-year floodplain and 1,500 feet of "drains, ditches, and streams remote from

any navigable-in-fact water and carrying only minor water-volumes toward it." 547 U.S. at 782; *cf. Summit Petroleum Corp. v. EPA*, 690 F.3d 733, 744 (6th Cir. 2012) (*Rapanos* interpreted "adjacent" to mean more than "'merely 'nearby'''").

    3. Case-By-Case Coverage Based Upon A Speculative Nexus. The Rule's approach to case-by-case "significant nexus" determinations is illegal. Justice Kennedy required a rigorous analysis to determine CWA jurisdiction, permitting federal jurisdiction over an intrastate water only after a holistic analysis of the intrastate water's impact on the "chemical, physical, and biological integrity" of a primary water. 547 U.S. at 780. In sharp contrast, the Rule permits a finding of "significant nexus" based solely upon a single function, such as "contribution of flow" or "export of food resources." 33 C.F.R. § 328.3(c)(5). For example, the Rule asserts jurisdiction based upon "dispersal" (80 Fed. Reg. at 37,063, 37,072, 37,094)—a concept that involves "[p]lants and invertebrates" that "hitchhike" on waterfowl (EPA, Connectivity of Streams & Wetlands to Downstream Waters 5-5 (2015)). Such an expansive approach cannot be reconciled with *Solid Waste Agency of North Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159 (2001) ("*SWANCC*"), which rejected CWA jurisdiction over isolated sand and gravel pits that hosted "approximately 121 bird species," including several that "depend upon aquatic environments for a significant portion of their life requirements." *Id.* at 164.

### D.    The WOTUS Rule Violates The Constitution

The WOTUS Rule violates the Constitution by asserting authority over isolated, intrastate waters and displacing the States' sovereign rights. The Supreme Court in *SWANCC* rejected the Agencies' assertion that certain isolated waters were "waters of the United States" because, *inter alia*, this would "alter[] the federal-state framework by permitting federal encroachment upon" the States' "traditional and primary power over land and water use." 531 U.S. at 173-74. The WOTUS Rule covers not only the isolated waters at issue in *SWANCC*, but also many other isolated waters and sometimes wet lands. The Rule thus violates the States' sovereign rights under the Tenth Amendment to manage and protect their intrastate waters. *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001).

## II.    The States Will Suffer Irreparable Injury Absent A Stay

The Agencies estimate that the Rule will increase CWA jurisdiction by 2.84 to 4.65 percent, 80 Fed. Reg. at 37,101, beyond pre-Rule practice. *See* Economic Analysis of the EPA-Army Clean Water Rule (May 2015). This includes, for example, a 17.1% increase in one significant category of waters that the Agencies themselves have described as "isolated," "intrastate," "non-navigable" waters. *Id.* at 7, 9. While the States believe this understates the Rule's reach, Stiles Decl. ¶6; Preston Decl. ¶7, the conceded increase will cause States two types of irreparable

harm, each of which is sufficient for a stay. *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991).

A. The WOTUS Rule deprives a sovereign State of control over its own waters and lands, and thus imposes irreparable harm for purposes of preliminary relief. *Kansas*, 249 F.3d at 1227. The States have the constitutional right to maintain "traditional and primary power over land and water use." *SWANCC*, 531 U.S. at 174. Consistent with this sovereign authority, the States manage and protect the lands and waters within their borders, while maintaining direct ownership over other intrastate land and waters.[5] But under the Rule, "the States will lose their sovereignty over intrastate waters that will then be subject to the scope of the Clean Water Act," thus satisfying the irreparable harm requirement. ND PI, at 16; *accord Wyoming v. Hoffman*, 423 F. Supp. 450, 453 (D. Wyo. 1976).

B. The Rule imposes costs on the States, and monetary harms imposed by federal rules are irreparable. "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). "[N]umerous courts have held that the inability to recover monetary damages because of sovereign immunity renders the harm suffered irreparable."

---

[5] *See, e.g.*, Ala. Code § 22-22-2; Ga. Code Ann. § 12-5-21(a); Ky. Rev. Stat. Ann. § 151.110(1)(a); Ohio Rev. Code § 6111.03; Tex. Water Code Ann. § 11.021(a); Utah Code Ann. § 73-1-1(3); W. Va. Code § 22-26-3.

*Odebrecht Constr., Inc. v. Sec., Fla. Dep't of Transp.*, 715 F.2d 1268, 1289 (11th Cir. 2013) (collecting cases); *Iowa Utils. Bd. v. FCC*, 109 F.3d 418 (8th Cir. 1996); *Texas v. United States*, 787 F.3d 733, 768 (5th Cir.2015); *Nalco Co. v. EPA*, 786 F. Supp. 2d 177, 188 (D.D.C. 2011). "It is undeniable that if the States incur monetary losses as a result of an unlawful exercise of regulatory authority, no avenue exists to recoup those losses as the United States has not waived sovereign immunity from suits seeking these sorts of damages." ND PI, at 16.

The Rule requires States to expend resources immediately on three CWA programs, thus imposing irreparable harm upon the States. ND PI, at 16-17.

*First*, the Rule requires States to expend resources under the CWA's WQS program. Under this program, States must update WQS that establish the water quality goals for all "waters of the United States," 33 U.S.C. § 1313, including preparing biennial reports on all such waters, 40 C.F.R. § 130.7(d), which the States must begin working on immediately to meet their deadlines, Stiles Supplemental Decl. ¶ 5. The Rule's expansion of CWA jurisdiction will require States to identify newly jurisdictional waters, Pigott Decl. ¶8; Stiles Supplemental Decl. ¶ 5, to determine whether these waters meet an already existing WQS and what designated uses apply to those waters, Stiles Decl. ¶10; Goodmann Decl. ¶5. This is a "resource-intensive and time-consuming" process, which will cost the state of Kansas alone "significantly greater resources" than $300,000, Stiles Decl.

17

¶¶8, 10, and will require immediate expenditures, Stiles Supplemental Decl. ¶¶ 4-7. When a water fails to meet the goals established in the WQS, the State must create a Total Maximum Daily Load, indicating the amount of a pollutant that may be discharged into the water.  40 C.F.R. § 130.7; *see also* Stiles Decl. ¶11; McClary Decl. ¶7.  Finally, States will need to expend resources to inventory and monitor the overall water quality of newly jurisdictional waters.  Stiles Decl. ¶12; McClary Decl. ¶8.  Failure to accomplish these tasks would severely delay citizens' ability to obtain Section 401 certifications necessary for federal permits, imposing harm on the States' citizens and businesses and delaying valuable projects.  Stiles Supplemental Decl. ¶7.

*Second*, the Rule requires States to expend resources on state certifications under the Section 404 program.  To discharge dredge and fill into "waters of the United States," a party must obtain a permit from the Corps under Section 404.  33 U.S.C. § 1344.  The permit process requires the applicant to obtain a certification from the State, under Section 401, attesting that the discharge will comply with the applicable state WQS.  *Id.* § 1341(a)(1).  Because the Rule expands the number of "waters of the United States," States will be required to expend additional resources under the Section 404 program to process and issue additional Section 401 certifications.  *See* Stiles Decl. ¶14; Pigott Decl. ¶9; Preston Decl. ¶8; Capp Decl. ¶5; McClary Decl. ¶10.  The Agencies have estimated that the Rule will

impose upon the States additional obligations of between $798,000 and $1.3 million, per year, under the Section 404 program alone. Economic Analysis, at 19.

*Third*, the Rule requires "the State[s] to create, process, and issue additional NPDES permits." Stiles Decl. ¶13; *see also* McClary Decl. ¶6. To discharge pollutants into a "water[] of the United States," a party must obtain an NDPES permit. 33 U.S.C. § 1342. Every plaintiff-State administers the NPDES permit program within its borders.[6] Given that the Rule expands the number of "waters of the United States," more individuals and business will apply for NPDES permits, thereby requiring additional state expenditures to process those permits. Stiles Decl. ¶14. The Agencies have projected that the Rule will impose additional obligations of between $527,000 and $770,000, per year, upon the States. *See* Economic Analysis, at 25-29.

## III.    The Balance Of Harms And The Public Interest Strongly Favor A Stay

The public would benefit greatly from a stay of the WOTUS Rule. A stay would help ensure the Agencies do not illegally assert authority beyond that delegated by Congress. If the Rule remains in effect during this litigation, farmers, homeowners, and small businesses will spend years and hundreds of thousands of dollars, *Rapanos*, 547 U.S. at 721, acquiring permits under a rule likely to be

---

[6]  33 U.S.C. § 1342(b); U.S. Envtl. Prot. Agency, Specific State Program Status, http://water.epa.gov/polwaste/npdes/basics/NPDES-State-Program-Status.cfm.

declared invalid. The pre-Rule regime has been in place for six years and the public will not suffer unduly by continuing that regime through this litigation, especially since all States have full power to protect waters not under federal authority, 33 U.S.C. § 1370. The Agencies, moreover, have justified the Rule as providing greater predictability in Agency decision making—rather than cleaner waters or greater environmental protection. 80 Fed. Reg. at 37,073. But this predictability interest is manifestly diminished where the Rule is already enjoined in thirteen States, and is likely to be struck down in any event.

A nationwide stay, in particular, would promote the public interest of equal treatment under the law. Currently, the WOTUS Rule's illegal expansion of federal jurisdiction applies in thirty-seven States, while thirteen States remain immune. Waters and sometimes wet lands that have the same relationship to the same interstate waters receive different treatment. A nationwide stay would be consistent with basic APA principles, *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1408-10 (D.C. Cir. 1998), equitable jurisprudence, *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979), and the uniform enforcement of federal law, *see Texas v. United States*, 787 F.3d 733, 768-69 (5th Cir. 2015).

## CONCLUSION

The States respectfully request that the Court grant the motion for a stay.

Respectfully Submitted,

**Case No. 15-3799**

*/s/ Daniel P. Bock*
BILL SCHUETTE
Michigan Attorney General

S. PETER MANNING
Division Chief
DANIEL P. BOCK
Assistant Attorney General
Environment, Natural Resources, and
Agriculture Division
525 W. Ottawa Street
P.O. Box 30755
Lansing, MI 48909
517-373-7540; 517-373-1610 fax
manningp@michigan.gov

*Counsel for State of Michigan*

*/s/ Eric E. Murphy*
MICHAEL DEWINE
Attorney General of Ohio

ERIC E. MURPHY
State Solicitor
LEE ANN RABE
Assistant Attorney General
PETER T. REED
Deputy Solicitor
30 East Broad Street, 17th Floor
Columbus, OH 43215
614-466-8980; 614-466-5087 fax
eric.murphy@
   ohioattorneygeneral.gov

*Counsel for State of Ohio*

*/s/ Elizabeth P. McCarter*
HERBERT H. SLATERY III
Tennessee Attorney General and Reporter

BARRY TURNER
Deputy Attorney General
ELIZABETH P. McCARTER
Senior Counsel
Office of the Attorney General and Reporter
Environmental Division
P.O. Box 20207
Nashville, Tennessee 37202
615-532-2582; 615-741-8724 fax
lisa.mccarter@ag.tn.gov

*Counsel for State of Tennessee*

**Case No. 15-3822**

*/s/ P. Clayton Eubanks*
P. CLAYTON EUBANKS
Deputy Solicitor General
SARAH A. GREENWALT,
Assistant Solicitor General
Office of the Oklahoma Attorney General
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 522-8992; (405) 522-0608 fax
Clayton.Eubanks@oag.ok.gov
Sarah.Greenwalt@oag.ok.gov

*Counsel for State of Oklahoma*

**Case No. 15-3853**

*/s/ Megan K. Terrell*
JAMES D. "BUDDY" CALDWELL
Attorney General of Louisiana
TREY PHILIPS
First Assistant Attorney General
MEGAN K. TERRELL
Deputy Director – Civil Division
Chief – Environmental Section
Assistant Attorney General
Office of the Louisiana Attorney
General
1885 N. Third Street
Baton Rouge, Louisiana 70802
Tel:  (225) 326-6020
Fax: (225) 326-6099

*Counsel for State of Louisiana*

/s/ *Mary Jo Woods*
JIM HOOD
Attorney General of the State of
Mississippi
MARY JO WOODS
Special Assistant Attorney General
Mississippi Attorney General's
Office
Post Office Box 220
Jackson, Mississippi  39205
mwood@ago.state.ms.us
Tel:  (601) 359-3020
Fax: (601) 359-2003

*Counsel for State of Mississippi*

*/s/ Richard B. Farrer*
KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General
BERNARD L. McNAMEE
Chief of Staff
SCOTT A. KELLER
Solicitor General
JAMES E. DAVIS
Deputy Attorney General for Civil
Litigation
JON NIERMANN
Chief, Environmental Protection Division
RICHARD B. FARRER
Assistant Solicitor General
MATTHEW B. MILLER
Assistant Attorney General
Texas Bar No. 24074722
matt.miller@texasattorneygeneral.gov
Southern District Bar No. 2638649
LINDA B. SECORD
Assistant Attorney General
Texas Bar No. 17973400
linda.secord@texasattorneygeneral.gov
Southern District Bar No. 1850549
Office of the Attorney General of Texas
Environmental Protection Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
Tel.  (512) 463-2012
Fax. (512) 320-0911

*Counsel for State of Texas*

## Case No. 15-3887

/s/ Britt C. Grant
Samuel S. Olens
  *Attorney General*
Britt C. Grant
  *Solicitor General*
Timothy A. Butler
  *Deputy Solicitor General*
James D. Coots
  *Sr. Asst. Attorney General*
OFFICE OF THE ATTORNEY GENERAL
40 Capitol Square, S.W.
Atlanta, Georgia 30334
bgrant@law.ga.gov
(404) 651-9453
  *Counsel for State of Georgia*

/s/ Elbert Lin
Patrick Morrisey
  *Attorney General*
Elbert Lin
  *Solicitor General*
Misha Tseytlin
  *General Counsel*
Erica N. Peterson
  *Assistant Attorney General*
OFFICE OF THE ATTORNEY GENERAL
State Capitol
Building 1, Rm 26-E
Charleston, West Virginia 25305
Elbert.Lin@wvago.gov
(304) 558-2021
  *Counsel for State of West Virginia*

/s/ Andrew Brasher
Luther Strange
  *Attorney General*
Andrew Brasher
  *Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
501 Washington Ave.
Montgomery, Alabama 36130
abrasher@ago.state.al.us
(334) 353-2609
  *Counsel for State of Alabama*

/s/ Allen Winsor
Pamela Jo Bondi
  *Attorney General*
Allen Winsor
  *Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
PL-01, The Capitol
Tallahassee, Florida 32399-1050
Allen.winsor@myfloridalegal.com
(850) 414-3300
  *Counsel for State of Florida*

/s/ Thomas M. Fisher
Gregory F. Zoeller
  *Attorney General*
Thomas M. Fisher
  *Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
302 West Washington Street

/s/ Craig A. Bromby
Sam M. Hayes
  *General Counsel*
Craig A. Bromby
  *Deputy General Counsel*
Andrew J. Norton
  *Deputy General Counsel*

Indiana Government Center - South, Fifth Floor
Indianapolis, Indiana  46204
(317) 232-6255
Tom.Fisher@atg.in.gov
*Counsel for State of Indiana*

NORTH CAROLINA DEPARTMENT OF ENVIRONMENT AND NATURAL RESOURCES
215 W. Jones Street
Raleigh, North Carolina 27603
sam.hayes@ncdenr.gov
craig.bromby@ncdenr.gov
andrew.norton@ncdenr.gov
(919) 707-8600
*Counsel for Petitioner North Carolina Department Of Environment and Natural Resources*

/s/ Jeffrey A. Chanay
Derek Schmidt
  *Attorney General*
Jeffrey A. Chanay
  *Chief Deputy Attorney General*
Burke W. Griggs
  *Assistant Attorney General*
OFFICE OF THE ATTORNEY GENERAL
120 SW 10th Ave., 3d Floor
Topeka, Kansas 66612
jeff.chanay@ag.ks.gov
burke.griggs@ag.ks.gov
(785) 368-8435
  *Counsel for State of Kansas*

/s/ James Emory Smith
Alan Wilson
  *Attorney General*
Robert D. Cook
  *Solicitor General*
James Emory Smith, Jr.
  *Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
1000 Assembly Street, Room 519
Columbia, South Carolina 29201
bcook@scag.gov
(803) 734-3680
  *Counsel for State of South Carolina*

/s/ Sean J. Riley
Jack Conway
  *Attorney General*
Sean J. Riley
  *Chief Deputy Attorney General*
OFFICE OF THE ATTORNEY GENERAL
700 Capitol Avenue, Suite 118
Frankfort, Kentucky 40601
sean.riley@ag.ky.gov
(502) 696-5650
  *Counsel for State of Kentucky*

/s/ Parker Douglas
Sean D. Reyes
  *Attorney General*
Parker Douglas
  *Chief of Staff & Federal Solicitor*
OFFICE OF THE UTAH ATTORNEY GENERAL
Utah State Capitol Complex
350 North State Street, Suite 230
Salt Lake City, Utah 84114-2320
pdouglas@utah.gov
(801) 538-9600
  *Counsel for State of Utah*

*/s/ Karla Z. Keckhaver*
 Brad D. Schimel
   *Attorney General*
Karla Z. Keckhaver
   *Assistant Attorney General*
WISCONSIN DEPARTMENT OF JUSTICE
17 West Main Street
Madison, Wisconsin 53707
keckhaverkz@doj.state.wi.us
(608) 264-6365
   *Counsel for State of Wisconsin*

**Nos. 15-3799, 15-3822, 15-3853, 15-3887**
**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| STATE OF OHIO, *ET AL.*, | : | |
|       Petitioners, | : | No. 15-3799 |
|       v. | : | |
| U.S. ARMY CORPS OF ENGINEERS, *ET AL.*, | : | |
|       Respondents. | : | |
| STATE OF OKLAHOMA, | : | |
|       Petitioner, | : | No. 15-3822 |
|       v. | : | |
| U.S. E.P.A., *ET AL.*, | : | |
|       Respondents. | : | |
| STATE OF TEXAS, *ET AL.*, | : | |
|       Petitioners, | : | No. 15-3853 |
|       v. | : | |
| U.S. E.P.A., *ET AL.*, | : | |
|       Respondents. | : | |
| STATE OF GEORGIA, *ET AL.*, | : | |
|       Petitioners, | : | No. 15-3887 |
|       v. | : | |
| U.S. E.P.A., *ET AL.*, | : | |
|       Respondents. | : | |

**STATE PETITIONERS' MOTION FOR STAY PENDING REVIEW**
**ADDENDUM**

# CONTENTS

Goodmann Declaration……………………………………………………………..1

McClary Declaration……………………………………………………….....5

Pigott Declaration……………………………………………………………..8

Preston Declaration…………………………………………………………...11

Stiles Declaration…………………………………………………….....16

Stiles Supplemental Declaration…………………………………………………..25

IN THE
**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT
OF GEORGIA**

STATE OF WEST VIRGINIA, *et al.*,

          Petitioners,

      v.

                                         Case No.
                                         2:15-CV-00079-LGW-RSB

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, *et al.*,

          Respondents.

**DECLARATION OF PETER T. GOODMANN**

I, Peter T. Goodmann hereby declare as follows:

1. I am the Director of the Division of Water, in the Commonwealth of Kentucky's Department for Environmental Protection, Energy and Environment Cabinet. I have been employed by Department for Environmental Protection since 1993, and have served in this capacity since 2013. As part of my duties, I am responsible for overseeing the implementation of the Clean Water Act in Kentucky, including developing Kentucky's Water Quality Standards (WQS), Monitoring and Assessing the Kentucky's water resources, developing Total Maximum Daily Loads (TMDL) and incorporating federal requirements to ensure the State's

1

National Pollutant Discharge Elimination System (NPDES) permitting program complies with the Clean Water Act (CWA). I also oversee the processing of state water quality certifications for all CWA permit applications pursuant to 33 U.S.C. § 1341(a)(1).

2. Based on my position, I have personal knowledge and experience to understand many of the steps the State will likely need to undertake in direct response to EPA and the Corps' *Clean Water Rule: Definition of "Waters of the United States"* (hereinafter "the Rule").

3. Based on the State's analysis I have determined that assessing the applicability of the Rule and the impacts on Kentucky's water quality programs is a complicated endeavor. Specifically, determining in general the potential for this rule to significantly expand the jurisdictional waters under the Clean Water Act, which is determined by the Corps on a case-by-case basis, is requiring this agency to expend additional resources, absent relief from this Court.

4. Under EPA and the Corps' own estimate, the Rule increases the number of waters that fall within the CWA by 2.84 to 4.65 percent, on a nationwide basis, beyond currently administered under the EPA's post-*Rapanos* guidance. U.S. Envtl. Prot. Agency & U.S. Dep't of the Army, Clean Water Rule: Definition of "Waters of the United States" 183 (2015).

2

5. The State has already expended resources as a direct result of the Rule, and expects to expend additional resources in the coming weeks and months. Specifically, in order to comply with the statutory requirements triggered by the "waters of the United States" definition the State has begun the process of assessing which waters of the State not currently covered by the post-Rapanos guidance will become CWA jurisdictional waters under the Rule. The State is conducting legal, technical and programmatic analyses of the Rule to determine the Rule's impact on the Commonwealth, in particular whether any additional jurisdictional waters will the impact on the State's regulatory domain and workload, as well as whether the Rule conflicts with the sovereign authority of the Commonwealth to manage and protect its waters. All waters in Kentucky are recognized as Waters of the Commonwealth and all surface waters receive protection of their water quality by Kentucky Water Quality Standards in 401 KAR Chapter 10.

6. Once the State has determined the legal applicability of the Rule, the State will attempt to estimate any additional miles of jurisdictional stream and acres of jurisdictional wetland. Such analysis is complicated by the fact that jurisdictional determinations are conducted by the USACE on a case-by-case basis; the State is by circumstance predetermining how the Corps will interpret and implement the rule. The State's efforts are limited to trying to

P000003

assess the overall (cf. specific) impacts. The State is developing a plan to address the implications of the Rule for the following programs administered by the State: (1) Water Quality Standards program conducted pursuant to 33 U.S.C. § 1313(c);   (2) Monitoring and Assessment of waters undertaken pursuant to 33 U.S.C. § 1315(b); (3) the Total Maximum Daily Load program pursuant to 33 U.S.C. § 1313(d); and (4) the Water Quality Certification program pursuant to 33 U.S.C. § 1341(a)(1)  in regards to the CWA dredge and fill permitting program pursuant to 33 U.S.C. § 1344(a).

7. The assessment of the Rule and the development of a plan is requiring staff to devote significant time and resources at the expense of other agency functions.

I declare under penalty of perjury that the foregoing is correct.  Executed on this 30th day of ___June___, at Frankfort, Kentucky.

Peter T. Goodmann

4

P000004

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

STATE OF OKLAHOMA                    )
ex rel. E. SCOTT PRUITT,             )
in his official capacity as Attorney )
General of Oklahoma,                 )
                                     )
          Plaintiff,                 )
                                     )
     v.                              )      Case No. 15-CV-381-CVE-FHM
                                     )
UNITED STATES                        )
ENVIRONMENTAL PROTECTION             )
AGENCY, et. al.                      )

## DECLARATION OF SHELLIE CHARD McCLARY

I, Shellie Chard McClary, hereby declare as follows:

1. I am the Water Quality Division Director for the Oklahoma Department of Environmental Quality ("ODEQ"). I have been employed by ODEQ and predecessor state agencies since October 1992 and have been Director of the Water Quality Division of ODEQ since January 1, 2010.

2. The primary function of the ODEQ Water Quality Division ("WQD") is to maintain clean water for Oklahoma by regulating facilities that produce and distribute public drinking water and that treat, transport, store, and discharge wastewater. WQD is also responsible, in cooperation with other state agencies, for maintaining water quality standards in Oklahoma's lakes, rivers, and streams. ODEQ also manages the Total Maximum Daily Load program for the State of Oklahoma and incorporates federal requirements to ensure the State's NPDES permitting program complies with the Clean Water Act ("CWA"). Finally, ODEQ is the lead state agency that administers the CWA Section 401 certification program in Oklahoma. The purpose of these certification reviews is to determine whether a proposed discharge will comply with Oklahoma's water quality standards.

# EXHIBIT A

1

P000005

3.  Based on my position I have personal knowledge and expertise in determining what steps the State will need to take in direct response to the Agencies Final Clean Water Rule; Definition of "Waters of the United States" ("Final Rule").

4.  Under EPA's and the Corps' own estimate, the Final Rule increases the number of waters that fall within the CWA by at least 2.84 to 4.65, on a nationwide basis. See U.S. Envtl. Prot. Agency & U.S. Dep't of the Army, Economic Analysis of the EPA-Army Clean Water Rule (May 2015) at 12-13 ("Economic Analysis").

5.  Under the CWA's certification program, Oklahoma must review each discharge and certify for all CWA permits that the discharge will comply with the State's water quality standards. 33 U.S.C. § 1341(a)(1). The Agencies estimate that the 2.84 to 4.65 percent increase in federal jurisdiction will cause a corresponding increase in costs to the States for implementation of this certification program.

6.  Under the NPDES program, anyone who wishes to discharge certain pollutants into a "water of the United States" must first seek a permit from the State. 33 U.S.C. §§1311(a), 1342(a). As a result of the increase in federal jurisdiction, if an entity wishes to discharge to a jurisdictional water which was not previously deemed jurisdictional, the State could see an increase in the number of permit applications, leading to an increase in administrative and compliance costs for the State.

7.  When a "water of the United States" exceeds the water quality standard assigned to it, the State must list it as an "impaired" water. Once a water is listed as "impaired," the State will restrict the maximum amount of pollutant allowed to enter the water by establishing a "total maximum daily load" (TMDL) for that water. 33 U.S.C. § 1313(d)(1)(C); 40 C.F.R. § 130.7. If there is an impairment to a new jurisdictional water, the State may be required to collect and review relevant data for each of the new waters determined to be jurisdictional. The State or an entity seeking to discharge into an impaired jurisdictional water could be required to establish a TMDL based on the available data.

2

P000006

8. Because the CWA requires that States report to EPA biennially on the quality of waters, parameter specific impairments of the water bodies, etc., the State may see an increase in workload and resources if additional waters are determined to be jurisdictional.

9. ODEQ and the State of Oklahoma already extensively regulate and protect the State's water resources through the statutorily defined "Waters of the State." *See* 27A § 1-1-201(20). "'Waters of the state' means all streams, lakes, ponds, marshes, watercourses, waterways, wells, springs, irrigation systems, drainage systems, storm sewers and all other bodies or accumulations of water, surface and underground, natural or artificial, public or private, which are contained within, flow through, or border upon this state or any portion thereof, and shall include under all circumstances the waters of the United States which are contained within the boundaries of, flow through or border upon this state or any portion thereof. Provided, waste treatment systems, including treatment ponds or lagoons designed to meet federal and state requirements other than cooling ponds as defined in the Clean Water Act or rules promulgated thereto and prior converted cropland are not waters of the state." *Id.*

10. While ODEQ does not have delegated authority over CWA Section 404 permitting, the expansion of jurisdictional waters could require ODEQ to issue additional State 401 certifications for CWA Section 404 applicants. 33 U.S.C. §1341 (a)(1). Under the dredge and fill program administered by the Corps, every applicant for a CWA Section 404 individual permit must obtain a certification from the state that the discharge will comply with the WQS of the State. If individual permit applications are filed on a previously non-jurisdictional water body that is now considered jurisdictional, additional staff, time, and resources will be required to complete these additional certifications.

I declare under penalty of perjury that the above statements are true and correct. Executed on the 23rd of July, 2015 in Oklahoma City, Oklahoma.

Shellie Chard McClary

3

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA**

STATE OF GEORGIA, *et al.,*          )
                                     )
    Petitioners,             )
                                     )
    v.                       )  Case No. 2:15-cv-00079-LGW-RSB
                                     )
REGINA A. MCCARTHY, in her           )
official capacity as Administrator of the  )
UNITED STATES ENVIRONMENTAL          )
PROTECTION AGENCY, *et al.,*         )
                                     )
    Respondents.             )

<u>STATEMENT OF BRUNO L. PIGOTT</u>

I, Bruno L. Pigott, hereby declare as follows:

1.  I am the Assistant Commissioner of the Office of Water Quality ("OWQ") at the Indiana Department of Environmental Management ("IDEM"). I have been employed by IDEM for fifteen (15) years, and I have been Assistant Commissioner of OWQ for ten (10) years.

2.  IDEM is an agency of the State of Indiana established by IC 13-13-1-1. Its mission is to implement federal and state laws and regulations to protect human health and the environment while allowing the environmentally sound operation of industrial, agricultural, commercial and governmental activities vital to a prosperous economy. OWQ is responsible for fulfilling IDEM's mission as to water quality.

3.  As Assistant Commissioner of OWQ, I am responsible for interpreting state and federal rules and regulations and for helping establish state policy for a number of environmental programs, including those governed by the federal Clean Water Act ("CWA"). The programs administered by OWQ include: Water Quality Standards, Total Maximum Daily Loads, National Pollutant Discharge Elimination System ("NPDES") permits and the CWA Section 319 Non-Point Source Pollution Control program. As such, I am keenly aware of the requirements of the CWA and how it affects the State of Indiana.

4. Indiana values both its water quality and its businesses. As evidence, I offer the fact that Indiana has, by the United States Environmental Protection Agency ("USEPA") definition, no backlog of NPDES permits. IDEM issues permits on a timely basis with sound requirements that protect water quality.

5. I have reviewed the joint, final "Clean Water Rule: Definition of 'Waters of the United States'" ("Final Rule") recently issued by USEPA and United States Army Corps of Engineers' (USACE), which provides a new definition for the phrase "waters of the United States" ("WOTUS"). Based on my experience, I understand how the Final Rule will affect the State of Indiana in general, and IDEM and the regulated community in particular. Overall, the Final Rule represents a significant expansion of federal authority over Indiana's non-navigable intrastate waters and lands that were never before subject to the CWA.

6. The new definition of WOTUS in the Final Rule is vague and represents a significant overreach of federal authority. Under the Final Rule, waters subject to federal regulation will include not only primary waters, impoundments and tributaries, but also "adjacent," "bordering" and "neighboring" waters, and some waters located within 100-year floodplains, regardless of whether such waters are reasonably connected to navigable, interstate waters. For instance, the Final Rule expands WOTUS to include waters "located within 1,500 feet of the ordinary high water mark." This distance is arbitrary, and it is often very difficult to pinpoint the "ordinary high water mark."

7. IDEM already protects Indiana's water quality by virtue of its authority over waters of the state, which Indiana statutes define as follows:

   *IC 13-11-2-265 "Waters" Sec. 265. (a) "Waters", for purposes of water pollution control laws and environmental management laws, means: (1) the accumulations of water, surface and underground, natural and artificial, public and private; or (2) a part of the accumulations of water; that are wholly or partially within, flow through, or border upon Indiana. (b) The term "waters" does not include: (1) an exempt isolated wetland; (2) a private pond; or (3) an off-stream pond, reservoir, wetland, or other facility built for reduction or control of pollution or cooling of water before discharge. (c) The term includes all waters of the United States, as defined in Section 502(7) of the federal Clean Water Act (33 U.S.C. 1362(7)), that are located in Indiana.*

8. Without relief from this Court, the overreach of the Final Rule will create significant and unnecessary burdens on both IDEM as regulator and Indiana's regulated community. The Final Rule imposes redundant and unclear regulatory requirements that will result in an inefficient use of limited regulatory resources by:

a.  Requiring regulatory oversight over drainage features that are not "accumulations of water" and therefore not waters that should be considered WOTUS;

b.  Demanding the time and attention of regulators to make the now-difficult determination of when and whether a feature is a WOTUS; and

c.  Generating unnecessary administrative appeals and lawsuits to resolve jurisdictional disputes.

9.  As an example of how the Final Rule will affect Indiana, anyone seeking to discharge dredge or fill material into a WOTUS is required to obtain a permit under Section 404 of the CWA from USACE. A prerequisite to a 404 permit is a Section 401 water quality certification. Because the Final Rule significantly expands the definition of WOTUS, the number of applications for Section 401 water quality certifications is likely to increase significantly. In situations where Section 401 certifications would have been necessary under current law, the scope of the impacted area will be significantly expanded by the Final Rule. As a result, the regulated community will need to seek more certifications, and IDEM will need to expend additional resources processing those applications. This is unacceptable in Indiana as a state that maintains a robust economy based on thriving industrial and agricultural business, and already regulates the quality of the waters at issue.

10. Indiana will be irreparably harmed by the implementation of the Final Rule due to the loss of unrecoverable resources of both time and money resulting from the inefficiencies that will result from the redundant, unnecessary and/or unclear regulatory requirements this overreach of authority imposes.

I declare under penalty of perjury that the above statements are true and correct. Executed on this 14 day of July, 2015, at Indianapolis, Indiana.

Bruno L. Pigott

IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA

STATE OF GEORGIA, EX REL. OWENS, *et al.*,

Petitioners,

v.

Case No. 2:15-cv-00079-LGW-RSB

REGINA A. MCCARTHY, *etc, et al.*,

Respondents.

## DECLARATION OF ___Heather Preston___

I, Heather Preston, hereby declare as follows:

1.    I am the Director of the Water Quality Division for the South Carolina Department of Health and Environmental Control (SCDHEC).  I have been employed by SCDHEC since 1993.

2.    The South Carolina Department of Health and Environmental Control ("DHEC") has the broad power and authority to abate, control and prevent pollution of the water resources of the State. DHEC's power includes authority to study and assess waters of the State, adopt and enforce water classification standards, issue national pollutant discharge elimination system permits (NPDES), issue surface water withdrawal permits and registrations, and issue Section 401 water quality certifications.  NPDES permits are issued pursuant to the South Carolina Pollution Control Act (PCA) and Section 402 of the Federal Clean Water Act (CWA).  State water quality certifications are issued pursuant to the PCA and Sections 401 and 404 of the CWA.

P000011

3.      As part of my duties, I am responsible for the issuance of state water quality certifications in accordance with Section 401 of the Federal Clean Water Act for Federal 404 permits for activities that may result in the discharge of dredge or fill material.

4.      I have personal knowledge and experience that allow me to understand the impacts to the State of South Carolina (the State) resulting from the EPA and the Corps' *Clean Water Rule: Definition of "Waters of the United States"* (hereinafter "the Rule" or "Final Rule").

5.      Based on my experience, I have determined that the Rule will have impacts on the federal jurisdiction of South Carolina's waters, absent relief from this Court.

6.      According to the EPA and the Corps' (the Agencies) own estimate, the Rule increases the number of waters that fall within the CWA jurisdiction by approximately 2.8 to 4.7 percent, on a nationwide basis, beyond what is currently administered under the EPA's post-*Rapanos* guidance.  The Agencies' estimate is contained in U.S. Envtl. Prot. Agency & U.S. Dep't of the Army, Clean Water Rule: Definition of "Waters of the United States" 183 (2015).

7.      Based upon my analysis, it is my opinion that the impact of the Rule to South Carolina waters has been underestimated and more waters than the Agencies acknowledge will become jurisdictional. I provide examples below to support this point.

a.      *Per Se* Coverage of all Tributaries

The Rule includes, for the first time, a definition for tributaries, 40 C.F.R. § 230.3(s)(1)(v), that will extend CWA jurisdiction to tributaries that contribute flow to jurisdictional waters and have the presence of a bed and bank and an ordinary high water mark. This broad definition of tributaries will result in *all* ephemeral tributaries being *per se* jurisdictional. The Agencies continue to assert that the Rule will "maintain all previous exclusions" and will not result in any

P000012

new permitting requirements, but this assertion is belied by the facts. The Agencies have made a policy shift in the treatment of tributaries. Under the 2008 post-*Rapanos* guidance, ephemeral waters required a case specific analysis to determine jurisdiction. The fact that all tributaries are now *per se* jurisdictional represents an expansion of CWA jurisdiction that will result in new permitting requirements.

b.   <u>Expanded Definition of Adjacent Waters</u>

The Rule's "adjacent waters" category will extend CWA jurisdiction to several waters across the State that are not currently considered jurisdictional. The Rule expands the definition of "adjacent" waters in several respects. First, the current regulations refer to adjacent "wetlands" whereas the Rule now refers to adjacent "waters." The Rule also includes a new definition for "neighboring" waters that includes as *per se* jurisdictional all waters located within 100 feet of the ordinary high water mark of a jurisdictional water, all waters in the 100-year floodplain of jurisdictional waters (but not more than 1,500 feet from the ordinary high water mark of such waters), and all waters located within 1,500 feet of the high tide line of a jurisdictional water. Furthermore, the entire water will be considered adjacent and therefore jurisdictional if any portion is located within such boundary.

By comparison, the 2008 post-*Rapanos* guidance extended *per se* jurisdiction only to those wetlands adjacent to traditional navigable waters. The post-*Rapanos* guidance required a significant nexus analysis to determine jurisdiction for wetlands adjacent to non-navigable tributaries that are not relatively permanent

P000013

and those wetlands adjacent to, but not directly abutting, relatively permanent non-navigable tributaries.

c.    The New Definition for Significant Nexus will Result in CWA Jurisdiction for More Waters

The Rule includes a definition of significant nexus that is used to determine if other waters are jurisdictional on a case specific basis. The definition includes a list of functions relevant for the significant nexus evaluation including: sediment trapping, nutrient recycling, pollutant trapping, runoff storage, export of organic matter, export of food resources, etc. For determining CWA jurisdiction, the Final Rule states that, "A water has a significant nexus when any single function or combination of functions performed by the water, alone or together with similarly situated waters in a region, contributes significantly to the chemical, physical, or biological integrity of the nearest waters identified in paragraphs (1)(i) through (iii)." Thus, when evaluating other waters to determine if they are jurisdictional, any single one of these functions could be sufficient to determine that they have a significant nexus to a jurisdictional water and are therefore jurisdictional themselves. Given such broadly written language, it is my opinion that any waters could be found to have Federal jurisdiction.

8.    For the reasons outlined above, I believe the Rule clearly represents an expansion of Federal jurisdiction. The expansion of Federal jurisdiction will likely result in an increase in the number and scope of water quality certification reviews by SCDHEC staff. This will require more staff time and additional resources in order to maintain the same level of state program

P000014

oversight. Increased costs to the regulated community will be another likely result of the expansion of Federal jurisdiction.

I declare under penalty of perjury that the foregoing is correct. Executed on this *16th* day of *July* , at *Columbia, South Carolina*

*Heather Preston*

Heather Preston

P000015

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA

STATE OF GEORGIA, *et al.*,

        *Petitioners*,

      v.                    Case No. 2:15-cv-00079-LGW-RSB

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, *et al.*,

        *Respondents*.

## DECLARATION OF THOMAS C. STILES

I, Thomas C. Stiles, hereby declare as follows:

1. I am the Chief of the Watershed Planning, Monitoring and Assessment Section for the Kansas Department of Health and Environment ("KDHE"). I have been employed by KDHE since 1998. As part of my duties, I am responsible for developing Water Quality Standards ("WQS") and Total Maximum Daily Loads ("TMDL") and interpreting their requirements to ensure the State's National Pollutant Discharge Elimination System ("NPDES") permitting program and the Section 319 Non-Point Source Pollution Control program are consistent with the Clean Water Act ("CWA").

1

2. I have personal knowledge and experience to understand many of the steps the State will need to undertake in direct response to the U.S. Environmental Protection Agency ("EPA") and U.S. Army Corps of Engineers' ("Corps") Clean Water Rule: Definition of "Waters of the United States" (hereinafter "the Rule").

3. Based on my work, I have determined that the Rule will force Kansas to expend substantial resources, absent relief from this Court.

4. The Rule will undercut Kansas in its sovereign role as the primary regulator of land and water resources within the State. It will impose Federal oversight of CWA requirements on marginal waters and divert Kansas' finite resources to address protection of those marginal waters, predominantly ephemeral streams, to the detriment of the critical waters that rightfully demand the attention of the Kansas agencies to restore and protect their water quality for the use of all Kansans.

5. All waters in Kansas are recognized as Waters of the State and receive protection of their water quality by Kansas Water Quality Standards, notably the general narrative criteria that apply to all waters, whether within or outside of CWA jurisdiction. Furthermore, State law (K.S.A. 82a-2001, *et seq.*) provides that any water receiving a discharge from a NPDES activity or facility becomes a classified water, i.e., a Water of the

P000017

U.S. Thereupon, numeric criteria may also be applied to that water and it is protected from any effects of the discharge by State authorities. The Rule will not extend any additional beneficial protection to such water.

6. Under EPA and the Corps' own estimate, the Rule increases the number of waters that fall within the CWA by 2.84 to 4.65 percent, on a nationwide basis, beyond those currently administered under the EPA's post-*Rapanos* guidance. U.S. Envtl. Prot. Agency & U.S. Dep't of the Army, Clean Water Rule: Definition of "Waters of the United States" 183 (2015). In Kansas, the transition from the current inventory of classified waters falling under the CWA to the potential inclusion of streams defined by the National Hydrography Database ("NHD") increases stream miles under Federal jurisdiction over five-fold, from 30,620 miles to over 174,000 miles.

7. Kansas currently protects all perennial and intermittent streams under the full provisions of the CWA, but, by State law, excludes ephemeral streams, those streams that only flow in response to random rainfall events. These ephemeral streams, which are identified under the NHD, constitute the majority of expanded waters placed under Federal jurisdiction. Again, these ephemeral streams are protected as Waters of the State, but otherwise represent marginal waters with limited capacity to support the designated

P000018

uses of Kansas, especially aquatic life, recreation and domestic water supply.

8. At the beginning of the millennium, Kansas conducted hundreds of Use Attainability Analyses to affirm the designated uses of the classified waters in the Kansas Surface Water Register, at an annual cost of $300,000. With the order of magnitude expansion of Kansas classified streams induced by the Rule, the State will need to expend significantly greater resources to inventory the designated uses of these streams, many of which are dry a majority of the time.

9. The Rule immediately and substantially increases the scope of three programs the State administers: (1) Water Quality Standards (303(c)); (2) Total Maximum Daily Loads (303(d)); and, (3) the National Water Quality Inventory (305(b)). All three programs are dependent upon monitoring programs with their appurtenant staff, logistical, laboratory and database resources.

10. The CWA requires States, including Kansas, to establish WQS for all "Waters of the United States." 33 U.S.C. § 1313; 40 C.F.R. § 130.3, § 131.3(i), 131.4(a). Because of the Rule, at a minimum, Kansas must determine which waters were added to CWA jurisdiction and, through the Use Attainability Analysis process, what designated uses apply to those

4

P000019

waters. Based on our experience 15 years ago, we know the process is resource-intensive and time-consuming.

11. For waters that fail to satisfy their WQS, the State must establish a TMDL for the water. 40 C.F.R. § 130.7. The TMDL outlines the maximum amount of a pollutant that can be discharged into the water so that the water complies with the WQS. The State must conduct a scientific analysis of the water in order to determine the maximum amount of individual pollutants that the water can sustain. The State must then implement the TMDL through its NPDES permitting and 319 non-point source pollution programs. Kansas establishes its TMDLs on a watershed basis and subjects all waters, jurisdictional or not, to appropriate controls to abate contributions of impairing pollutants from any tributary. With the Rule, there will be impetus to assess the newly jurisdictional waters. Since most of these waters are ephemeral and flow only in response to rain, the runoff comprising their flow will likely contain pollutants at levels above the WQS, even as the duration of the flows will be relatively short. Monitoring of those conditions will slate those streams as impaired, thereby demanding a TMDL. Dedication of staff and analytical resources to develop a TMDL on a marginal water diverts those resources away from priority waters needing restoration. If a marginal water contributes

5

impairing loads to a classified water in Kansas, it will be dealt with through the TMDL program. But the Rule raises the status of the marginal water to require its own TMDL, a waste of time and resources for no environmental gain.

12. Under CWA Section 305(b), EPA and, by extension, the States must inventory and report on the overall water quality of waters in the Nation (or the State). With the expanded number of stream miles now jurisdictional under the Rule, the demand for assessment data on those waters will place additional stress on the monitoring programs designed to evaluate status and trends of water quality in those waters. Once again, the diversion of limited resources to streams that are marginal diminishes the ability to characterize the water quality of critical waters in the State and does nothing to expand the knowledge of statewide water quality conditions, as expected by the CWA.

13. The Rule requires the State to create, process, and issue additional NPDES permits. 33 U.S.C. § 1342. Kansas administers the NPDES permitting program, in accordance with federal standards established by EPA. Any person or entity wishing to discharge a pollutant into "Waters of the United States" must obtain an NPDES permit from the State. In Kansas, any NPDES discharge to any stream invokes a status of classified water on that

6

Case: 15-3799    Document: 24    Filed: 09/09/2015    Page: 50

stream, applying the full authority of the CWA. The Rule creates a redundancy that is not needed since any such waters are already protected under State law.

14. While not a program under KDHE authority, we expect more applications for 404 permits under the Rule and its expanded scope of jurisdictional waters. The Rule will also require KDHE to issue additional state 401 certifications for CWA 404 permit applicants. 33 U.S.C. § 1341(a)(1). Every applicant for a CWA 404 permit in Kansas, under the dredge and fill program administered by the Corps, must obtain a certification from the State attesting that the discharge will comply with the WQS. With the increase in the number of jurisdictional waters, more individuals will apply for dredge and fill permits. This will require the State to complete additional state certifications.

15. The State will be irreparably harmed because the State cannot recover diverted resources from the federal government. In the absence of the Rule's requirements, the State will deploy these resources to critical and priority waters to implement state laws and state programs. If this Court issues an injunction against the Rule, Kansas will immediately halt any plans to redesign its monitoring network and associated planning and

P000022

management activities to accommodate inclusion of environmentally marginal streams.

16. It needs to be noted that a majority of the impairments seen in Kansas waters are associated with non-point sources of pollution, reflecting the prevailing land uses in the watersheds of those waters. As such, the Federal government has no authority to extend protections to those waters against those sources that lie outside the scope of the CWA. Therefore, the expansion of waters into the jurisdiction of the CWA by the Rule does not extend any protection to those waters. The Rule merely expands the demands placed on the monitoring and planning capacity of Kansas to waters too marginal for environmental benefit.

17. One of the motivations for the Rule is protection of downstream waters. However, once again, Federal authority for extending that protection comes through either issuance of water quality standards or NPDES permits. Both of those vehicles are fully equipped in Kansas to protect water quality on jurisdictional streams as well as downstream waters. The Kansas TMDL program accounts for downstream impacts through the use of the watershed approach in implementing the TMDLs to all upstream contributing areas, whether jurisdictional or not. Finally, the CWA cannot impose controls on non-point sources of pollution, regardless of their

8

Case: 15-3799    Document: 24    Filed: 09/09/2015    Page: 52

impact to downstream waters. Hence, expansion of streams under the Rule does nothing to extend additional safeguards for downstream waters beyond what is already authorized and implemented by Kansas with current programs applied to Waters of the State, including Waters of the U.S.

I declare under penalty of perjury that the foregoing is correct. Executed on this _10th_ day of June, 2015, at Topeka, Kansas.

Thomas C. Stiles

P000024

Case: 15-3799    Document: 24    Filed: 09/09/2015    Page: 53

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA

STATE OF GEORGIA, *et al.*,

      *Petitioners*,

      v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, *et al.*,

      *Respondents*.

Case No. 2:15-cv-00079-LGW-RSB

**SUPPLEMENTAL DECLARATION OF THOMAS C. STILES**

I, Thomas C. Stiles, hereby declare as follows:

1. I am the Chief of the Watershed Planning, Monitoring and Assessment Section for the Kansas Department of Health and Environment ("KDHE"). I have been employed by KDHE since 1998. As part of my duties, I am responsible for developing Water Quality Standards ("WQS") and Total Maximum Daily Loads ("TMDL") and interpreting their requirements to ensure the State's National Pollutant Discharge Elimination System ("NPDES") permitting program and the Section 319 Non-Point Source Pollution Control program are consistent with the Clean Water Act ("CWA").

2. I have personal knowledge and experience to understand many of the steps the State will need to undertake in direct response to EPA and the Corps' Clean Water Rule: Definition of "Waters of the United States" (hereinafter "the Rule").

3. I submit this declaration to respond to certain points made regarding my original declaration in the opposition to the States' preliminary injunction motion filed by the Environmental Protection Agency and the Army Corps of Engineers ("the Agencies").

4. Kansas must and will begin immediate work as a direct result of the Rule.

5. As the Agencies point out in their opposition, Kansas must submit its biannual report, by April 1, 2016, including its inventory of water quality impaired waters which will require development of Total Maximum Daily Loads at some later date. *See* 33 U.S.C. § 1313(d)(2)    In order to properly prepare this inventory, the State will be required to determine what new waters are jurisdictional under the Rule,  and consider any existing and readily available information collected by other individuals and agencies pertaining to the water quality of such new waters in determining their status relative to water quality standards, and consequently, place such water in the inventory of water quality impaired waters or justify why such waters do not belong in that inventory. *See* 33 U.S.C. § 1315(b)(1).  This process will be a time-consuming endeavor and must begin immediately, if the State is to comply with the April 1, 2016 deadline.

6. As I explained in my original declaration, under the CWA's Water Quality Standards ("WQS") program, Kansas must immediately begin work to determine which waters will be added to CWA jurisdiction and, through the Use Attainability Analysis process, what designated uses apply to those waters.  .

7. The Agencies in their opposition suggest that Kansas can simply refuse to conduct such a Use Attainability Analysis, and refuse to determine their status under Section 303(d), until this litigation is completed.  However, failure to take these steps would make it impossible for the State to certify compliance with the States' WQS under Section 401, which is necessary for any Federal permit.  Furthermore, any new or expanding NPDES wastewater discharge permit for a facility located on newly jurisdictional waters cannot

2

be issued if those waters are deemed water quality impaired until a wasteload allocation is established for that discharge and all sources causing or contributing to the impaired condition have schedules of compliance established.    Accordingly, following the Agencies' suggested path would impose significant harms upon the State of Kansas and its citizens, including delaying citizens' ability to obtain Federal permits in a timely manner.  The State of Kansas cannot and will not impose these harms upon its citizens and businesses.

8.    The Agencies also argue that the State of Kansas can waive Section 401 certifications for Federal permits and activities.  The Section 401 certification is a core right of the State of Kansas, as part of the CWA's cooperative federalism structure to assure its water quality standards are upheld.  The State processes each Section 401 certification request, pursuant to standard procedures, and this process takes time and agency resources to complete.  Since the Rule will increase the number of Federal licenses andpermit applications, it will increase the burden on the State to conduct its due diligence.

9.    The Agencies also suggest that the State of Kansas could raise its permitting fees, to cover the additional permitting, monitoring and reporting obligations imposed by the Rule under the NPDES, Section 106 and Section 303(d) programs.  Whether to charge its citizens a fee and how much to charge are sovereign decisions of the State of Kansas, which the Agencies cannot dictate.  In any event, changes in fee structures would require new rules and legislation, which cannot be implemented immediately.

P000027

Case: 15-3799    Document: 24    Filed: 09/09/2015    Page: 56

I declare under penalty of perjury that the foregoing is correct.

Executed on this 4th day of August, 2015, at Topeka, Kansas.

Thomas C. Stiles

P000028

## CERTIFICATE OF SERVICE

I hereby certify that on September 9, 2015, I caused the foregoing Motion For Stay Pending Review to be served via the Court's CM/ECF system on all registered counsel.

**No. 15-3822**

*/s/ P. Clayton Eubanks*
P. CLAYTON EUBANKS
Counsel for State of Oklahoma

**No. 15-3799**

*/s/ Eric E. Murphy*
ERIC E. MURPHY
Counsel for State of Ohio

**No. 15-3887**

*/s/ Elbert Lin*
ELBERT LIN
Counsel for State of West Virginia

I hereby certify that on September 10, 2015, I plan to file the foregoing Motion For Stay Pending Review to be served via the Court's CM/ECF system on all registered counsel.

**No. 15-3853**

*/s/ Richard B. Farrer*
Richard B. Farrer
Counsel for State of Texas